UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------X

JOHN GUARNERI,

              Petitioner,                 **MEMORANDUM & ORDER**

   - against –                    16-cv-5868 (KAM)

NANCY A. BERRYHILL, Acting Commissioner
of Social Security

              Respondent.

----------------------------------------X

**MATSUMOTO, United States District Judge:**

      Pursuant to 42 U.S.C. § 405(g), plaintiff John
Guarneri ("plaintiff") appeals the final decision of defendant
Acting Commissioner of Social Security ("defendant" or the
"Commissioner"), denying plaintiff's application for Social
Security Disability Insurance ("SSDI") benefits under Title II
of the Social Security Act (the "Act") on the grounds that
plaintiff is not disabled within the meaning of the Act.
Plaintiff alleges that he is disabled under the Act and is thus
entitled to receive SSDI benefits, due to severe medically
determinable mental and physical impairments that have prevented
him from performing any work since March 2012.

      Presently before the court are defendant's motion for
judgment on the pleadings and plaintiff's cross-motion for
judgment on the pleadings, both pursuant to Fed. R. Civ. P.
12(c).  For the reasons set forth below, the Commissioner's

motion for judgment on the pleadings is denied, plaintiff's
motion for judgment is denied, and the case is remanded for
further proceedings consistent with this Memorandum and Order.

## BACKGROUND

Plaintiff applied for Social Security Disability
Insurance benefits on July 11, 2013, alleging an onset date of
disability of September 4, 2012. (ECF No. 20, Administrative
Transcript ("Tr."), filed 09/08/2017, at 150-56.)[1] The
application was denied on December 3, 2013. (Tr. 67.)
Plaintiff made a timely request for a hearing before an
Administrative Law Judge ("ALJ"), and a hearing was held with
ALJ Dina R. Loewy ("the ALJ") on April 16, 2015. (Tr. 29-56,
83.) On June 23, 2015, the ALJ found that plaintiff was not
disabled under the Act. (Tr. 8-23.) Plaintiff requested review
from the Appeals Council on August 17, 2015. (Tr. 272-83.) The
Commissioner's decision became final when plaintiff's request
for review was denied by the Appeals Council on September 1,
2016. (Tr. 1-4.) Plaintiff commenced the instant action on
October 21, 2016, (ECF No. 1, Complaint ("Compl."), filed
10/21/2016) and the parties' motions were fully briefed on
September 8, 2017.

---

[1] Citations to the transcripts of the state court proceedings refer to the
internal paginations and not the page number assigned by the Electronic Case
Filing ("ECF") system.

## I. <u>Plaintiff's Medical History</u>

### A. Plaintiff's Treating Sources

#### 1. Dr. Vincent DeGennaro

Plaintiff saw Dr. DeGennaro, an internist, monthly from August 2008 through March 2015.[2]  (Tr. 365-71, 378-90, 594-97, 598-625, 628-30.)  In September 2012, Dr. DeGennaro listed diagnoses of obstructive sleep apnea, chronic sinusitis, and cervical disc disease.  (Tr. 366.)  Imaging of plaintiff's spine in September 2012 showed left paracentral disc protrusions at C3-4 and C5-6, mild central disc protrusion at C4-5, and mild left paracentral disc protrusion at C6-7, all of which were unchanged since an MRI taken in 2002.  (Tr. 402-03.)  Imaging also showed a degenerative lumbar disc which had progressed since the last MRI.  (Tr. 404.)  In October 2012, Dr. DeGennaro added diagnoses for hyperactive airway disease and lumbar disc disease.  (Tr. 367.)  In December 2012, plaintiff had a coronary artery angiogram that showed multiple 20% blockages and left ventricular hypertrophy.  (Tr. 397-98.)  In January 2013, Dr. DeGennaro added GERD[3], esophageal ulcer, and coronary artery disease to plaintiff's growing list of diagnoses.  (Tr. 368.)

---

[2] Plaintiff saw Dr. DeGennaro as early as 2002, but records were only provided from 2008 on given the onset of disability was listed as September 4, 2012. (Tr. 494.)

[3] GERD is an abbreviation for Gastroesophageal reflux disease.  Mayo Clinic, Gastroesophageal Reflux Disease, Patient Care & Health Information page. https://www.mayoclinic.org/diseases-conditions/gerd/symptoms-causes/syc-20361940 (last accessed April 12, 2019.)

In April 2014, plaintiff saw Dr. Woloszyn of The Hand Treatment Center based on Dr. DeGennaro's referral. (Tr. 715.) Plaintiff had complained of numbness and tingling in both hands as well as weakness and discomfort. (*Id.*) Dr. Woloszyn diagnosed plaintiff with bilateral carpal tunnel syndrome, greater in the right hand. (*Id.*) The doctor recommended right intercarpal decompression, which would be a "minimally invasive" procedure followed by a similar procedure on the left hand. (*Id.*) Plaintiff, however, said that the risk of general anesthesia with sleep apnea prevented him from having any surgeries. (Tr. 36-37.)

In March 2015, Dr. DeGennaro filled out a "Patient Functional Assessment to Do Sedentary Work" form for the period of September 4, 2012 to March 2015, which provided his medical opinion with respect to plaintiff's functional capacity. (Tr. 632-33.) Dr. DeGennaro concluded that during an 8-hour workday, plaintiff could: stand or walk for less than 2 hours, sit for less than 2 hours, lift or carry more than 5 lbs., but less than 10 lbs. for up to 5 hours and 20 minutes. (Tr. 632.) The doctor listed the following limitations for plaintiff during the work day: bed rest, frequent breaks of 15 minutes or more, pain preventing 8 hours of work, medications that interfere with work abilities, being off task for more than 10% of the work day, and needing 3 or more sick days a month. (Tr. 633.) Under

"clinical findings," Dr. DeGennaro listed tendinosis and tears in both shoulders, disc protrusions in C5-6, C4-5, L3-4, L4-5, L5-5, bilateral severe carpal tunnel, and left lumbar radiculopathy. (*Id.*)

### 2. Dr. Thomas Kilkenny

In September 2002, plaintiff began seeing Dr. Thomas Kilkenny, a pulmonologist, reporting shortness of breath and nasal and sinus problems following plaintiff's work at the World Trade Center ("WTC") site. (Tr. 494-502.) In a letter to Dr. DeGennaro, Dr. Kilkenny stated that plaintiff had no such symptoms before exposure to the WTC site. (Tr. 494, 500.) Plaintiff reported to Dr. Kilkenny that a continuous positive airway pressure ("CPAP") machine to treat sleep apnea was difficult for him to use due to nasal congestion and that he suffered from excessive sleepiness. (Tr. 495.) Dr. Kilkenny did not believe that plaintiff could work full time at his job collecting refuse at the WTC site. (*Id.*) When plaintiff saw Dr. Kilkenny eight years later with similar symptoms, Dr. Kilkenny concluded that plaintiff "demonstrate[d] signs of ongoing obstructive sleep apnea syndrome." Tr. 503.)

Dr. Kilkenny wrote a letter dated September 18, 2012 in which he explained that plaintiff was being treated for sleep apnea and suffered from "severe nasal congestion and coughing" and was "constantly short of breath." (Tr. 405, 505.) Dr.

Kilkenny wrote that plaintiff had shown "no significant improvement" despite treatment, and that plaintiff suffers "tremendous somnolence." (*Id.*) Dr. Kilkenny concluded that plaintif was "not functional and [was] not able to perform complex duties without difficulty due to the excessive sleepiness" and that plaintiff was "not capable of performing his work duties and [] should be considered disabled." (*Id.*) The doctor performed a full physical exam of plaintiff before reaching these conclusions, noting everything was normal except "general appearance" due to nasal congestion. (Tr. 506-07.) Dr. Kilkenny's assessment at the time included obstructive sleep apnea, obesity, and shortness of breath. (Tr. 507.)

Plaintiff saw Dr. Kilkenny next in December 2012. (Tr. 508.) The doctor noted that plaintiff's pulmonary function test was "essentially normal except for signs of obesity." (*Id.*) The physical exam and assessment were unchanged since the September 2012 visit. (Tr. 508-09.)

Dr. Kilkenny performed a polysomnography on plaintiff on February 19, 2014. (Tr. 513.) The doctor concluded that plaintiff's sleep apnea could be "completely reversed" with a specific application of a BiPAP mask for the CPAP machine. (Tr. 514.) Dr. Kilkenny also recommended an "aggressive course of weight loss" if plaintiff had a BMI over 30 and that plaintiff follow up with a sleep physician. (*Id.*) On July 8, 2014, Dr.

Kilkenny wrote a letter stating that plaintiff has sleep apnea, reflux disease, obstructive airways disease, and upper respiratory disease. (Tr. 517.) The doctor believed that plaintiff's sleep apnea was related to the WTC exposure. (*Id.*)

### 3. Dr. Jack D'Angelo

Plaintiff began seeing Dr. D'Angelo, a physiatrist, in January 2014 due to complaints of progressive neck and back pain that have "persisted with difficulty in pain control." (Tr. 634.) Plaintiff complained of being unable to lift or carry anything without pain, numbness and burning in his legs, and stiffness and pain in his neck and lower back. (*Id.*) Dr. D'Angelo found the same disc protrusions as Dr. DeGennaro above. (*Id.*) Upon physical exam, Dr. D'Angelo found trigger points at multiple areas, muscle strength of 5/5, and sensation intact. (Tr. 636.) Dr. D'Angelo diagnosed plaintiff with a herniated cervical disc and lumbar radiculopathy. (*Id.*) Dr. D'Angelo wanted plaintiff to get upper and lower extremity electrodiagnostics, to commence mobility and strengthening program, and consider epidurals or adjustment of medications. (*Id.*)

Plaintiff had an upper and lower extremity electromyography, as recommended by Dr. D'Angelo, on January 31, 2014. (Tr. 637.) Dr. Christopher Perez conducted the EMG and concluded that plaintiff had bilateral carpel tunnel syndrome,

with moderate severity on the right and mild on the left. (Tr. 638.) The doctor also found left-sided lumbar radiculopathy affecting the L4 level. (*Id.*)

Plaintiff followed up with Dr. D'Angelo on February 10, 2014. (Tr. 639.) Dr. D'Angelo's review of symptoms listed only "motor disturbances" and "sensory disturbances" as positive. (Tr. 640.) Dr. D'Angelo added carpal tunnel syndrome, myalgia, and fatigue to plaintiff's list of diagnoses. (Tr. 641.) Dr. D'Angelo recommended bilateral wrist extension splints for the carpel tunnel, and noted the difficulty of managing plaintiff's pain due to myalgia and injuries to his lower spine. (*Id.*) The doctor suggested trying Gabapentin or Lyrica for the pain before attempting epidurals. (*Id.*) Plaintiff reduced the number of therapy sessions, but the doctor insisted he do his exercises daily. (Tr. 641-42.) Dr. D'Angelo concluded his notes by stating that plaintiff "is certainly not able to complete the tasks of his job and is not apparently able to be gainfully employed." (Tr. 642.) Plaintiff returned to Dr. D'Angelo on April 14, 2014 and June 30, 2014. (Tr. 643-45.) On June 30, 2014 Dr. D'Angelo noted that plaintiff stopped taking Gabapentin because it was making him jittery, but began taking Flexeril which seemed to help. (*Id.*) Plaintiff also had a new limitation in the range of motion in his right shoulder due to pain, and the doctor added rotator cuff tendonitis to

plaintiff's list of diagnoses.  (Tr. 649-50.)  Plaintiff had
also lost 60 lbs. using the paleo diet.  (*Id.* at 150.)  However,
Dr. D'Angelo doctor still noted that plaintiff was not able to
be gainfully employed.  (Tr. 651.)

Plaintiff returned to Dr. D'Angelo on July 23, 2014
for another follow up.  (Tr. 652.)  Plaintiff noted that he was
having greater difficulty cleaning, cooking and dressing.  (*Id.*)
Plaintiff felt a stabbing pain in his right shoulder.  (Tr. 652,
655.)  The doctor went over plaintiff's MRI of his right
shoulder, which showed mild tendinosis, severe degenerative
change of the acromioclavicular joint with significant edema,
tearing of the superior labrum, and mild subacromial bursitis.
(Tr. 520, 652.)  Plaintiff returned again five days later on
July 28, 2014, and Dr. D'Angelo added to his list of diagnoses a
skin burn on plaintiff's shoulder due to icing, and "acute
cervical impingement with myofascial pain."  (Tr. 658.)

On August 27, 2014, plaintiff returned and Dr.
D'Angelo noted he received a corticosteroid injection in his
shoulder which "essentially stopped helping."  (Tr. 659.)
Plaintiff then had an MRI on his left shoulder on September 10,
2014, which found superior labral anterior to posterior tear
(SLAP), moderate acromioclavicular osteoarthritis associated
with bone marrow edema, and mild tendinosis of the rotator cuff.
(Tr. 527-28.)

Plaintiff's next follow up was October 1, 2014, where he reported that his carpel tunnel had gotten worse in his right hand, such that he could not use his hand to open anything. (Tr. 664.) Hyperlipidemia was added to plaintiff's medical history. (*Id.*) Plaintiff saw Dr. D'Angelo again on March 30, 2015, with the doctor noting a decreased range of motion in plaintiff's left shoulder. (Tr. 672.)

On March 30, 2015, Dr. D'Angelo filled out a "patient functional assessment to do sedentary work" for the period of September 4, 2012, until the present. (Tr. 632-33.) Dr. D'Angelo concluded that plaintiff could sit, stand and/or walk less than two hours per work day, and lift and/or carry more than five pounds but less than 10 pounds for approximately two hours and 40 minutes of an eight-hour work day. (Tr. 632-33.) Doctor D'Angelo indicated that plaintiff required bed rest during a workday, would need frequent breaks of 15 minutes or more, would have difficulty concentrating, would be taking medicine that interferes with his ability to function in the work setting, and would be absent three or more days per month due to illness. (Tr. 633.) Dr. D'Angelo listed the diagnoses consistent with his prior notes and attached those to the form. (*Id.*)

*4. Dr. Richard Fazio*

Plaintiff saw Dr. Fazio, a gastroenterologist, between November 2012 and July 2013 based on a referral by Dr. DeGennaro. (Tr. 189.) Dr. Fazio performed an upper endoscopy on plaintiff on December 7, 2012 and reported finding grade B esophagitis, ulcer of esophagus, and mild gastritis. (Tr. 399.) In March 2013, Dr. Fazio reported on a colonoscopy performed on plaintiff, which found internal hemorrhoids, non-specific colitis, diverticulosis of the colon with narrowing, and a rectal polyp. (Tr. 391.) Dr. Fazio performed another endoscopy in March 2013, which found mild gastritis and grade C esophagitis. (Tr. 393.) In November 2013 plaintiff had a CT-scan of his abdomen and pelvis due to left lower quadrant abdominal pain. (Tr. 475.) The CT-scan revealed a "fat containing umbilical hernia," and the doctor diagnosed plaintiff with acute sigmoid diverticulitis. (Tr. 475-76.)

Dr. Fazio filled out a form for New York State disability purposes in August 2013 where he checked off "no limitation" to all questions about plaintiff's ability to sit, stand and/or walk, lift, push and/or pull, or other. (Tr. 433-38.)

*5. Dr. Armin Tehrany*

Plaintiff was referred to Dr. Tehrany, an orthopedist, by Dr. D'Angelo, who saw him on August 8, 2014. (Tr. 717.) Dr.

Tehrany found full range of motion in both shoulders, but noted that patient resisted him on the right shoulder. (*Id.*) Right shoulder strength was found to be 4/5 and left shoulder was 5-/5. (*Id.*) Dr. Tehrany discussed the need for surgical repair of the right shoulder and that it would need to be done at Mount Sinai due to plaintiff's sleep apnea. (*Id.*)

*6. Examinations Through the WTC Health Program*

Plaintiff was first examined at the World Trade Center Medical Health Group ("WTC Group") on October 4,2014. (Tr. 298.) Plaintiff answered questions about the days and hours of his exposure to the WTC site in his job for the sanitation department. (Tr. 351-57.) Dr. Christine Huang examined plaintiff and noted his complaints of sinusitis, rhinitis, GERD, sleep apnea, shortness of breath, chest tightness, wheezing, and coughing. (Tr. 299.) By letter, Dr. Huang advised plaintiff that these symptoms could be signs of a "serious underlying health problem," but noted that her physical exam had "no unusual findings." (*Id.*) Dr. Huang recommended he schedule an appointment for further evaluation of his symptoms. (*Id.*) Plaintiff also had a chest x-ray taken at his October 4 visit which was unremarkable. (Tr. 350.)

On October 12, 2012, Dr. Alex Stepensky examined plaintiff as part of the WTC Group treatment plan. (Tr. 304.) Dr. Stepensky found "crowded airways" and a "large tongue" on

physical examination. (Tr. 305.) The doctor also noted that plaintiff's symptoms were "out of proportion to physical exam." (*Id.*) Plaintiff was referred to an ENT doctor, a pulmonologist, a gastroenterologist, and a social worker evaluation for possible psychiatric intake. (*Id.*) Dr. Fred Lin, a head and neck doctor, saw plaintiff on December 19, 2012, to treat his chronic rhinitis. (Tr. 309.) Dr. Lin noted that plaintiff had left-sided nasal septal deviation and chronic inflammatory changes to the nasal mucosa, "but a patent nasal airway that was not consistent with his complaints." (*Id.*) A nasal endoscopy was conducted that day, finding chronic rhinitis and septal deviation. (Tr. 315-16.)

Plaintiff returned to see Dr. Stepensky on January 11, 2013. (Tr. 319.) Dr. Stepensky wrote that plaintiff's obesity was "driving many of his symptoms" and prescribed plaintiff Orlistat to assist with weight loss. (Tr. 322.) On January. 23, 2013, plaintiff returned again and Dr. Stepensky noted that plaintiff "[s]till can't use CPAP" machine. (*Id.*) Dr. Stepensky also wrote that he was unsure if plaintiff's two weeks of exposure to the 9/11 site was enough to cause his nasal symptoms. (*Id.*)

On January 31, 2013, plaintiff saw Mr. Malgorzata A. Land at a follow up visit to the WTC group. (Tr. 331.) The doctor noted that plaintiff's symptoms have become

"progressively worse over the years" and that he is still unable to tolerate his CPAP machine. (*Id.*) Dr. Land wrote that plaintiff had "full range of motion of upper and lower extremities." (Tr. 333.) The doctor indicated he would request certification of plaintiff into the WTC group coverage, and wanted plaintiff to return to the WTC monitoring program annually. (*Id.*) Plaintiff returned to Dr. Land on May 28, 2013 and the doctor noted "difficulty sleeping" and "improved depression" under psychiatric symptoms. (Tr. 336, 338.) Plaintiff reported limited relief of his congestion from Asterpro and sinus rinses. (Tr. 339.) The physical exam revealed "nasal turbinates erythematous and inflamed/edematous," "crowded oropharynx," and a full range of motion in plaintiff's extremities. (Tr. 338.) Plaintiff reported he was only using his CPAP sporadically, and removed it if he experienced nasal congestion during the night. (*Id.*) At the time, patient was seeing a psychiatrist once per week and took Wellbutrin, an anti-depressant. (Tr. 339-40.) Plaintiff was having coughing fits leading to shortness of breath a couple times a week and used Albuterol once a day for shortness of breath caused with or without exertion. (Tr. 339.) Plaintiff took Vicodin sporadically to treat his back pain, which restricted his exercise. (*Id.*)

In June 2014, plaintiff was certified by the WTC health program to be covered for upper respiratory disease, GERD, obstructive airway disease, and obstructive sleep apnea. (Tr. 684-85.)  At a July 17, 2014 follow up visit, plaintiff was seen by Dr. Yelena Globina.  (Tr. 689.)  Plaintiff had lost seventy pounds and reported being able to walk up one flight of stairs.  (Tr. 686.)  Plaintiff informed Dr. Globina that he was using Albuterol rescue for shortness of breath more than once daily, and had trouble using his CPAP machine when coughing or when he had a respiratory infection.  (Tr. 686-87.)  Physical exam showed diffuse wheezing, a crowded oropharynx, and full range of motion in both extremities.  (Tr. 688-89.)  The doctor recommended that plaintiff follow up with his pulmonologist to start Advair, with his ENT to start fluticasone for his chronic rhinitis, and to return in three months to the WTC group.  (Tr. 689.)

On October 21, 2014, plantff was seen again by Dr. Globina.  (Tr. 693.)  Plaintiff reported improved persistent nasal congestion, feeling well on his GERD medicine other than morning hoarseness and reflux, and improved shortness of breath with Advair, but still experienced it with exertion.  (Tr. 690.)  Plaintiff reported hurting his shoulder when he removed his CPAP mask overnight and stated that he was unable to breathe with the mask from his CPAP machine.  (Tr. 691.)  The physical exam

revealed that plaintiff appeared "somewhat anxious," still had a crowded oropharynx, and limited bilateral shoulder range of motion to 90 degrees. (Tr. 692.) The doctor recommended trying "relaxation techniques" instead of inhaler for anxiety. (Tr. 692.)

### 7. *Dr. Pavel Filimonov*

On September 18, 2012, plaintiff first saw Dr. Pavel Filimonov, a psychiatrist. (Tr. 535-36.) A substantial portion of the doctor's notes are indecipherable, including many sections that seem important to reaching a determination in this case. Based on the illegible portions of the notes, court does not feel confident in establishing facts in the record from Dr. Filimonov beyond what follows. (Tr. 535-571.)

Dr. Filimonov diagnosed plaintiff with Post-traumatic Stress Disorder (PTSD) and found a GAF score of 60 during plaintiff's September 18 visit. (Tr. 536.) In October 2013, Dr. Filimonov filled out a form for the New York State Office of Temporary and Disability Assitance about the plaintiff. (Tr. 462.) The doctor noted plaintiff's PTSD diagnosis and symptoms including "frequent flashbacks of traumatic memories, feeling safe only at house, . . . impaired concentration, and severly impaired sleep." (*Id.*) Plaintiff's prognosis was listed as "poor." (Tr. 463.) Plaintiff had tried two medicines, including Zoloft, but they failed due to "severe side effects."

(Tr. 464.)  Dr. Filimonov also found limitations in plaintiff's concentration, social interactions, and adaptations.  (Tr. 467.) The doctor also concluded that plaintiff was unable to do work related mental activities due to his "constant state of anxiety and inability to sleep."  (Tr. 466.)

Dr. Filimonov filled out a "Medical Assessement of Ability to Do Work-Related Activities (MENTAL)" form in 2015 in which he listed PTSD and "major depressive" as diagnoses.  (Tr. 531.)  The doctor checked off "no useful ability to function" for all categories under "making occupational adjustments." (*Id.*)  Dr. Filimonov wrote that plaintiff "is not capable of working in any capacity due to his symptoms of severe PTSD" including "frequent flashbacks," "feelings of impending doom," and being "chronically sleep deprived," which causes poorly controlled angry outbursts.  (*Id.*)  The doctor also indicated that plaintiff had "no useful ability to function" in all three categories under "making performance adjustments," and that plaintiff is "prone to unpredictable flashbacks/anxiety attacks," which keep him confined to his home.  (Tr. 532.)  The unpredictable nature of plaintiff's symptoms made him "unable to follow any work schedule."  (Tr. 533.)  The doctor also noted that plaintiff had "high sensitivity to side effects of psychiatric" medication, which "rendered use of SSRIs impossible."  (Tr. 534.)  As a result, plaintiff needed to be

treated with Valium, which "can also impair his concentration and performance." (*Id.*)

### 8. Dr. Steven Newman

On March 27, 2013, plaintiff saw Dr. Steven Newman, a psychiatrist, to evaluate whether plaintiff should remain on medical leave. (Tr. 478.) Dr. Newman said plaintiff was tense, anxious, worried, with his speech withheld and his affect constricted. (Tr. 479.) Plaintiff reported severe anxiety that kept him awake and left him drained and unable to work. (*Id.*) Dr. Newman confirmed plaintiff's PTSD diagnosis and GAF score of 60. (*Id.*) The doctor's conclusion was that plaintiff could not "return to work now or in the foreseeable future" because he is "psychiatrically distressed and disabled." (*Id.*)

### 9. Dr. Brickell Quarles

On September 20, 2013, plaintiff saw Dr. Brickell Quarles, a psychiatrist, as part of a consultative evaluation on behalf of the Social Security Administration. (Tr. 446-50. 456-60.) Plaintiff reported his past use of Wellbutrin, Remeron and other medications, which he stopped due to side effects. (Tr. 447.) Dr. Quarles described plaintiff as calm, cooperative, but also depressed with a blunted affect. (Tr. 448.) Plaintiff got tearful at times but appeared to give honest answers with clear speech and logical thoughts. (*Id.*) The doctor found no major limitations in concentration or intellectual functioning, but

plaintiff displayed poor auditory delay recall.  (*Id.*)

Plaintiff was only able to recall 1/3 items after 3 minutes, but

had above-average forward digit span of 10 and an average

backward digit span of 5.  (*Id.*)  Plaintiff completed 5/5 steps

of the serial sevens test and his insight and judgment appeared

good.  (Tr. 449.)  The doctor found that plaintiff's allegations

appear consistent with the exam and his exam and vocational

history were consistent.  (*Id.*)  Dr. Quarles diagnosed plaintiff

with PTSD and dysthymic disorder with a guarded prognosis given

plaintiff's exposure to a "significant traumatic event and his

difficulties with recovering thus far."  (*Id.*)  However, Dr.

Quarles concluded that plaintiff did have the ability to "follow

and understand simple and complex instructions and directions"

but with "some limitations in being able to effectively complete

these tasks when depressed or anxious."  (Tr. 450.)  Plaintiff

was unable to live independently and displayed difficulties

relating to others.  (*Id.*)

### B.  Testimony Before the ALJ

Plaintiff testified at a hearing before the ALJ on

April 16, 2015.  (Tr. 29-30.)  Plantff's wife drove plaintiff to

the hearing and plaintiff reported that he spends most of his

days resting and reading to find new ways to improve his health.

(Tr. 33-34.)  Plaintiff reported trouble treating his sleep

apnea due to chronic nasal congestion.  (Tr. 34.)  Plaintiff

reported taking Advair, Ventolin, Nexium, Xanax, Valium, Vicodin, Flexural and Flonase, along with low gram aspirin and a sinus rinse. (*Id.*) He testified he never had surgery because he feared the side effects, especially given his sleep apnea, which he was warned could cause complications. (Tr. 37, 45.) Plaintiff testified that he had pain in both shoulder, numbness and stabbing pain radiating down his left leg. (Tr. 37-38.) Plaintiff testified that he dropped items around the house due to numbness in his hands. (Tr. 47.) Plaintiff further testified that could only walk for about 250-300 feet, stand for about 15 minutes, sit for maybe 30 minutes, and carry maybe five pounds. (Tr. 38-39.) He also suffered from coughing, shortness of breath and panic attacks so severe that he had called 911 in the past. (Tr. 40-41.) Plaintiff testified that he slept only two to three hours most nights and could not concentrate during the day. (Tr. 42-43, 46.) Plaintiff reported that his nasal congestion created a feeling of suffocation when wearing his CPAP mask. (Tr. 43-44.) Finally, plaintiff testified that he did not socialize and that his children are not a part of any team or club because he is afraid they will get hurt. (Tr. 46-47.)

Raymond Sesna, a vocational expert, also testified at the April 16, 2015 hearing before the ALJ. (Tr. 29-30.) The ALJ gave Mr. Sesna a list of limitations the ALJ believed

plaintiff had and then asked Mr. Sesna for his opinion on if there were any jobs in the national economy for which someone with those limitations could perform.  The limitations listed by the ALJ were: light work, occasionally climbing ramps or stairs, but only up to one flight of stairs, never climbing ladders, ropes or scaffolds, occasionally balancing, stooping, kneeling, never crouching or crawling, no full bending, squatting only a third of the way, only occasional and partial neck rotation, frequent handling and fingering, only occasional overhead reach, no exposure to extreme temperatures, wetness, and humidity, no moderate exposure to irritants, unskilled work, only occasional decision making, only occasional changes in work setting, only occasional, superficial interaction with the public, and only occasional supervision.  (Tr. 50-51.)  Mr. Sesna reported three jobs fitting those limitations: photocopy machine operator, mail clerk, and office helper.  (Tr. 51.)  However, there would be no jobs available if plaintiff was also limited any one of the following: sedentary level work, being off task more than 15% of the day, inability to be exposed to extreme temperatures, cigarette smoke, perfumes, solvents, cleaners, odors, gases, needing 3 or more sick days per month, or no useful ability to interact with the public, supervisors, being independent, maintaining concentration and dealing with work stress.  (Tr.

52-54.)  All of these conclusions came from Mr. Sesna's personal observations.  (Tr. 53-54.)

### C.  The ALJ's June 23, 2015 Decision

On June 23, 2015, ALJ Dina R. Loewy submitted a written decision finding plaintiff was not disabled under sections 216(i) and 223(d) of the Social Security Act ("the Act").  (Tr. 11-23.)  The ALJ used the five-step analysis set forth in the SSA Regulations (the "Regulations") at 20 C.F.R. § 404.1520(a).  (Tr. 11-12.)

At step one, the ALJ found that plaintiff met the insured status requirements of the Act through December 31, 2017.  (Tr. 12.)

At step two, the ALJ found that the claimant had the following severe impairments: "nasal rhinitis, sleep apnea, gastritis and esophagitis, degenerative disc disease of the lumbar and cervical spine, bilateral carpal tunnel syndrome, degenerative joint disease of the bilateral shoulders, post-traumatic stress disorder (PTSD), dysthymic disorder, and obesity."  (*Id.*)

At step three, the ALJ found that "the claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (*Id.*) The ALJ analyzed whether plaintiff met listings 1.02 (major

dysfunction of joints), 1.04 (disorders of the spine), 3.02
(chronic respiratory disorders), 3.03 (asthma), 5.06
(inflammatory bowel disease (IBD)), or 12.04 (depressive,
bipolar and related disorders).  (Tr. 13-15.)

Listing 1.02 (major dysfunction of joints) was not met
or equaled because the ALJ found that there was "no evidence
that the claimant has lost the ability to perform fine and gross
movements effectively."  (Tr. 13.)  The ALJ cited the "internist
consultative examiner" finding an ability to finger roll and
snap, and records of Dr. Woloszyn documenting "full range of
motion and normal motor strength" in plaintiff's hands.  (*Id.*)

Listing 1.04 (disorders of the spine) was found to not
be met because the ALJ found "no evidence of motor loss, sensory
loss, reflex loss, or a positive straight leg raise test."  (Tr.
14.)  The ALJ also cited the "internist consultative examiner"
finding "normal gait, 5/5 muscle strength, and no reflex or
sensory loss" along with no evidence of "spinal arachnoiditis,
lumbar spinal stenosis, or inability to ambulate effectively."
(*Id.*)  In addition, the ALJ cited plaintiff's "treating
physician" documenting "normal sensation, muscle strength and
reflexes, along with a negative straight leg raise."  (*Id.*)

Listings 3.02 (chronic respiratory disorders) and 3.03
(asthma) were found not to be met because the ALJ claimed that
there was no "evidence of FEV1 or FVC values meeting the levels

set forth in the listings," chronic impairment of gas exchange, chronic asthmatic bronchitis, or frequent asthma attacks requiring physician intervention. (*Id.*) The ALJ found that pulmonary function testing in December 2012 was "essentially normal" and that there were no hospital visits for breathing difficulties. (*Id.*)

Listing 5.06 (inflammatory bowel disease (IBD)) was found to not have been met by the ALJ because she found "no evidence of a bowel obstruction, anemia, reduced serum albumin, an abdominal mass, perineal disease, involuntary weight loss, or need for supplemental nutrition." (Tr. 15.)

The ALJ also found that even when accounting for the effect of plaintiff's obesity on the various physical listings above, as set forth in SSR 02-01p, the listings are still not met. (*Id.*)

As for mental listings, the ALJ found that plaintiff did not meet the listings for 12.04 (depressive, bipolar and related disorders) or 12.06 (anxiety and obsessive compulsive disorders) because plaintiff did not qualify for two of the criteria in "paragraph B": "marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration." (*Id.*) The ALJ found that plaintiff

only had moderate restrictions in activities of daily living.
(*Id.*)  Though the plaintiff's wife did all cooking, cleaning,
and household, the ALJ considered plaintiff's ability to manage
his personal care, drive short distances, shop, and manage
money.  (*Id.*)  The ALJ found that limitations on plaintiff's
activities did not rise to a "marked degree" and plaintiff's
activities were only "somewhat limited."  (*Id.*)

        The ALJ found that plaintiff only had moderate
difficulties with social functioning despite reporting that he
tended "towards isolation" and did not have many friends.  (*Id.*)
The ALJ found that plaintiff's "spending time with his immediate
family" demonstrated only a moderate difficulty, in addition to
the psychiatric consultative examiner describing plaintiff as
"calm, cooperat[ive], fairly groomed, with good eye contact" and
only "some difficulties" relating to others.  (Tr. 14-15.)

        With regard to concentration, persistence and pace,
the ALJ found only moderate difficulties.  (Tr. 15.)  While the
ALJ acknowledged the plaintiff alleged problems with attention
and concentration, she pointed to the consultative examination
showing he could spell "world" "backwards and forward, recite
the days of the week backwards, complete simple calculations,
and perform serial sevens" in finding no marked limitation.
(*Id.*)

The ALJ found there were no episodes of decompensation. (*Id.*) Thus, the "paragraph B" criteria were not satisfied. (*Id.*) The ALJ also considered whether "paragraph C" criteria were satisfied, and found they were not because there were no periods of decompensation and no evidence that a "minimal increase in mental demands or change in environment would cause [plaintiff] to decompensate." (*Id.*)

In step four, the ALJ found that plaintiff had residual functional capacity to perform light work with the following limitations: "occasionally climb ramps or stairs (but only up to 1 flight of stairs), and never climb ladders, ropes or scaffolds; occasionally balance, stoop or kneel, but never crouch or crawl; never fully bend; squat only 1/3 of the way; occasionally perform neck rotation (but rarely performing a full neck rotation); frequently handle and finger; only reach overhead occasionally with the left upper extremity and never reach overhead with the right upper extremity; must avoid concentrated exposure to extreme temperatures, wetness or humidity; and must avoid even moderate exposure to irritants. Regarding the mental demands of work, the ALJ found that plaintiff could perform unskilled work requiring only occasional decision-making or changes in the work setting; and involving only occasional, superficial interaction with the public and co-workers, and occasional supervision." (Tr. 15-16.) To find

this, the ALJ first looked at whether there were medical impairments and then to what extent the intensity, persistence, and limiting effects affected the plaintiff's functioning.  (Tr. 16.)  After summarizing the plaintiff's testimony, the ALJ concluded that plaintiff's impairments could cause some of his "alleged symptoms[,]" but that plaintiff's "statements concerning the intensity, persistence and limiting effects of those symptoms are not entirely credible."  (*Id.*)

First, as to the plaintiff's rhinitis and sleep apnea, the ALJ found that plaintiff's symptoms are "manageable with treatment."  (Tr. 17.)  The ALJ cited a 2012 CT showing no evidence of sinus inflammation and a note by Dr. Lin that the "patent nasal airway . . . was not consistent with [plaintiff's] symptoms."  (*Id.*)  The ALJ also cited Dr. Stepensky's note in October 2012 saying plaintiff's symptoms were "out of proportion to [the] physical exam."  (*Id.*)  The ALJ noted that Dr. Kilkenny said plaintiff's symptoms had been "completely resolved with therapy" in 2002, but then reported that plaintiff suffered from severe nasal congestion with shortness of breath in 2012.  (*Id.*)  Dr. Kilkenny also reported in 2012 that plaintiff's pulmonary function testing was "normal except for signs of obesity."  (*Id.*)  Despite pulmonary function testing in January 2014 showing restriction, the ALJ pointed to an October 2014 report that said plaintiff's congestion had improved, which the ALJ

found suggested that plaintiff's rhinitis and sleep apnea have improved. (*Id.*)

Gastritis and esophagitis were found to contribute to light exertional restrictions, with the ALJ concluding the condition appeared to be mild and manageable with medication. Despite various tests in 2012 and 2013 finding esophagitis, mild gastritis, an esophageal ulcer, colitis, and diverticulosis, the ALJ pointed to an examination by Dr. Potack in January 2013 where plaintiff reported "rare nausea, no vomiting, no dysphagia, no odynophagia, and no abdominal pain." (*Id.*) The ALJ also cited the plaintiff reporting "feeling well" in October 2014 with use of Nexium and Pepcid. (*Id.*)

The plaintiff's orthopedic impairments were analyzed next, and the ALJ acknowledged various tests that demonstrated disc protrusions at C3-4, C4-5, C5-6, L3-4, L4-5, and L5-S1, left-sided lumbar radiculopathy at the L4 level, bilateral carpal tunnel syndrome (moderate on right, mild on left). (Tr. 17-18.) 2014 images of plaintiff's right shoulder showed mild tendinosis, severe degenerative changes, a torn labrum, mild bursitis, and the left shoulder showed a labral tear, osteoarthrosis, and mild tendinosis. (Tr. 18.) The ALJ cited consistent reduced range of motion in the cervical spine with tender trigger points found by Dr. D'Angelo beginning in January 2014, positive Tinel's in both wrists starting in April 2014,

and limited range of motion in the left shoulder in July 2014. (*Id.*) The ALJ cited to an internist consultative exam in September 2013 showing limited straight leg raise, neck rotation limited to 0-10 degrees, but normal hand dexterity and fine manipulation with 5/5 muscle strength, normal gait. (*Id.*) Plaintiff was able to squat 1/3 of the way and bend 0-70 degrees, but ambulated unassisted. (*Id.*) Dr. Woloszyn found full range of motion in plaintiff's hands but recommended surgery for bilateral carpal tunnel syndrome. (*Id.*) Dr. Tehrany, despite finding a full range of motion in both shoulders, recommended surgery on plaintiff's right shoulder at Mount Sinai to accommodate the risk from plaintiff's sleep apnea. (*Id.*)

The ALJ also found evidence that plaintiff's obesity complicated his existing orthopedic and respiratory impairments. (*Id.*) Plaintiff's most recent evidence of his BMI was that of 33.7 in July 2014, and the ALJ noted the prior mentioned pulmonary function test showing signs of obesity. (*Id.*) The extra weight on the plaintiff's frame was also found to "doubtlessly aggravate[] his orthopedic impairments." (*Id.*)

As for mental impairments, the ALJ cited treating records from Dr. Filimonov who saw plaintiff since September 2012 and who diagnosed PTSD with a GAF score of 60 (and the same score in October 2013). (Tr. 18-19.) The ALJ stated that

plaintiff could not tolerate medications and was not taking any
psychiatric medications other than Valium. (Tr. 19.) Dr.
Newman examined plaintiff, in March 2013, to see if he should
return to work and found plaintiff anxious with withheld speech,
constricted affect, a GAF of 60 and diagnosed PTSD. (*Id.*) The
ALJ also cited the psychiatric consultative examiner, Dr.
Quarles, found no major limitations on plaintiff's concentration
and intellectual functioning, with poor auditory recall, but
good recent and remote memory. (*Id.*) Dr. Quarles also found
plaintiff pass simple tests and 5 steps of the series 7 before
diagnosing plaintiff with PTSD and dysthymic disorder. (*Id.*)

In sum, the ALJ found that plaintiff suffered from
various medically determinable orthopedic, respiratory,
gastrointestinal and mental impairments, but still remained
capable of working within the "bounds of the residual functional
capacity assessment" made by the ALJ. (*Id.*) The ALJ also found
that while plantiff's wrists and shoulders had certain
limitations, their ranges of motions and functioning appear
"largely intact." (*Id.*)

The ALJ also expressed doubt about the credibility of
the claimant's allegations of disability. (*Id.*) Specifically,
the ALJ found that despite the "plethora of impairments
alleged," the claimant's "treatment has been rather minimal and
conservative." (*Id.*) The ALJ referred to plaintiff failing to

follow up for surgery on either of his wrists or his shoulder, and found that plaintiff's stated fear of sedation with sleep apnea was unfounded because doctors were still recommending the procedures and were aware of his sleep apnea. (Tr. 19-20.) The ALJ also pointed to the absences of common epidural steroid injections to treat serous orthopedic impairments, and noted that the plaintiff only attempted four physical therapy sessions before asking to have them reduced. (Tr. 20.) Regarding plaintiff's mental impairments, the ALJ noted that plaintiff was not taking any psychiatric medications other than Valium, and that the claim by plaintiff's doctor that he could not tolerate other medications was doubtful because there are so many that exist and the plaintiff did not appear to try many. (*Id.*)

The ALJ then discussed how much weight she gave to the various opinions of plaintiff's treating and consultative physicians. (*Id.*) First, she gave "some weight" to the internist consultative examiner who found plaintiff was "limited in fully squatting, bending and neck rotation," and noted these functions were accommodated in the residual functional capacity assessment. (*Id.*) However, the ALJ discounted other limitations, such as walking or standing, because they "appear to have been based upon [plaintiff's] subjective complaints and are inconsistent with the results" of the examiner's physical examination that plaintiff had normal gait, heel/toe walking,

and no motor, sensory, or reflex deficits.  (*Id.*)  Little weight was given to treating physicians Drs. DeGennaro and Dr. D'Angelo, both of whom found that plaintiff was limited below the "full range of sedentary work."  (*Id.*)  Both doctors assessed "extreme standing, walking, sitting, and lifting/carrying tolerances, a need for bedrest during the day, and an average of 3 or more sick days per month.  (*Id.*)  The ALJ found these assessments extreme given plaintiff's "minimal and conservative treatment" and inconsistent with "some of the good clinical findings" that Dr. D'Angelo "documented consistently."  (*Id.*)  Among the consistent good clinical findings the ALJ cited were: "full range of motion in the lumbar spine, a negative straight leg raise, normal reflexes, and normal sensation and muscle strength in the lower extremities."  (*Id.*)  The ALJ determined the good clinical findings suggested that plaintiff would be able to sit for more than two hours a day.  (*Id.*)

Little weight was given to Dr. Fazio, who opined that plaintiff would have no work-related limitations, as the ALJ did not know in what context the doctor treated plaintiff or how often he saw him.  (*Id.*)

Little weight was given to Dr. Kilkenny, who submitted multiple letters over the years stating that plaintiff "is not capable of performing his work duties and should be disabled" due to sleep apnea.  (Tr. 21.)  The ALJ found the opinion

inconsistent with the doctor's "findings that the claimant's sleep apnea symptoms were completely resolved with the use of BiPAP, and his other symptoms improved with medication." (*Id.*) In addition, the ALJ found that Dr. Stepensky "questioned" Dr. Kilkenny when noting that "Dr. Kilkenny initially found the claimant to be 'benefiting from complete resolution of his symptoms as the disease has completely resolved with therapy,' but later submitted a letter stating the claimant had no significant improvement in his symptoms." (*Id.*) Accordingly, the ALJ gave little weight to Dr. Kilkenny due to these discrepancies. (*Id.*)

Little weight was given to psychiatrists Dr. Filiminov and Dr. Newman, both who found plaintiff was disabled. (*Id.*) The ALJ found Dr. Filiminov's "extreme limitations . . . wholly inconsistent with the GAF of 60 . . . which indicates moderate symptoms overall." (*Id.*) The ALJ also found extreme limitations "inconsistent with the largely normal mental status findings by Dr. Filiminov himself, and by the psychiatrist consultative examiner." (*Id.*) The ALJ concluded that the opinions of disability must have "been based largely upon the [plaintiff's] subjective complaints." (*Id.*)

Little weight was given to the opinion of the psychiatric consultative examiner who found plaintiff had some limitations in understanding simple and complex instructions

when depressed and anxious.  (*Id.*)  The ALJ found the examiner's conclusion that plaintiff was unable to live independently and displayed difficulties relating to others contradicted the examiner's "largely normal mental status findings."  (*Id.*)  The ALJ found that the examiner must have based his assessment "entirely upon the [plaintiff's] subjective description of his symptoms."  (*Id.*)

Although the ALJ found that plaintiff was not able to perform his past work duties, he did rely on the vocational expert who testified at the hearing that there were three jobs that plaintiff could perform.  (Tr. 21-22.)  Those jobs were: photocopy machine operator, office mail clerk, and office helper.  (Tr. 22.)  Accordingly, the ALJ affirmed the original decision of "not disabled" for the plaintiff.  (*Id.*)

## DISCUSSION

### II.  Standard of review

#### A.  The Substantial Evidence Standard

"Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action" in a district court.  42 U.S.C. § 405(g).  When a district court conducts such a review, it may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of

Social Security, with or without remanding the cause for a rehearing." *Id.*

"A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (quoting *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *accord* 42 U.S.C. § 405(g). Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Burgess,* 537 F.3d at 127-28 (quotation marks omitted) (quoting *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004)). The district court must "consider[] the whole record . . . because an analysis of the substantiality of evidence must also include that which detracts from its weight." *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (citations omitted).

If there is substantial evidence in the record to support the Commissioner's factual findings, those findings are conclusive and must be upheld, *see* 42 U.S.C. § 405(g), and "the [reviewing] court may not substitute its own judgment for that of the [ALJ], even if it might justifiably have reached a different result upon a *de novo* review." *Jones v. Sullivan,* 949

F.2d 57, 59 (2d Cir. 1991) (quoting *Valente v. Sec'y of Health & Human Servs.,* 733 F.2d 1037, 1041 (2d Cir. 1984)).

## B. Insured Status and Five-Step Disability Evaluation

To qualify for DIB and/or SSI, an individual must be disabled. 42 U.S.C. §§ 423(a)(1)(E), 1382(a)(1). An individual is disabled under the Act when he or she is not able "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last" for at least twelve continuous months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The impairment, or impairments, must be "of such severity that [the claimant] is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). To be eligible for DIB an individual must also have been insured within the meaning of 42 U.S.C. § 414 at the time he or she became disabled. 42 U.S.C. § 423(a)(1)(A); *see also* 42 U.S.C. §§ 423(c)(1) and 414(a)-(b) (defining insured status).

To determine whether a claimant is disabled, the SSA follows a five-step sequential analysis, as detailed below. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

### 1. Step One

At step one, the Commissioner determines whether the claimant is currently engaged in substantial gainful employment. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the claimant is engaged in substantial gainful activity, then his or her claim will be denied "regardless of [the claimant's] medical condition or [his or her] age, education, and work experience." 20 C.F.R. §§ 404.1520(b), 416.920(b). If the claimant is not engaged in substantial gainful employment, the Commissioner will proceed to step two.

### 2. Step Two

At step two, the Commissioner determines whether the claimant has a "severe medically determinable physical or mental impairment" or a "combination of impairments that is severe and meets [the SSA's] duration requirement." 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). A severe impairment "must result from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques," 20 CFR §§ 404.1521, 416.921, and must "significantly limit [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R §§ 404.1522(a), 416.922(a). Basic work activities include "physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;" ability to

see, hear, and speak; ability to understand, perform, and remember simple instructions; use of judgment; appropriate response to supervision, co-workers, and usual work situations; and ability to adjust to changes in a "routine work setting." 20 C.F.R. §§ 404.1522(b), 416.922(b).

In determining whether a claimant's physical or mental impairments are of "sufficient medical severity," the Commissioner "will consider the combined effect of all [the claimant's] impairments without regard to whether any [particular] impairment . . . would be of sufficient severity." 20 C.F.R. §§ 404.1523(c), 416.923(c). In assessing severity, however, the Commissioner will not consider the claimant's age, education, or work experience. 20 C.F.R. §§ 416.920(c), 404.1520(c).

When considering mental impairments, the Commissioner uses a "special technique" that examines "symptoms, signs, and laboratory findings" to determine whether the claimant has "medically determinable mental impairment(s)," the extent of the claimant's "functional limitations" and the "severity of [his or her] mental impairment(s)." 20 C.F.R. §§ 404.1520a(a)-(d), 416.920a(a)-(d).

Both physical and mental impairments "must be established by objective medical evidence from an acceptable medical source." 20 C.F.R. §§ 404.1521, 416.921. Additionally,

any such impairment, or combination of impairments, must meet the twelve-month duration requirement or be expected to result in death.  20 C.F.R. §§ 404.1509, 416.909.  If the Commissioner determines that the impairment is medically determinable and severe, then the Commissioner will proceed to step three.

### 3. Step Three

At step three, the Commissioner determines whether the claimant's impairment meets or equals an impairment or impairments found in the "Listing of Impairments" contained in appendix 1 of 20 C.F.R. part 404, subpart P and meets the duration requirement.  20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  If the Commissioner determines that the claimant's impairment meets or equals a "listed" impairment, and satisfies the duration requirement, then the Commissioner will find the claimant to be disabled regardless of age, education, or work experience. 20 C.F.R. §§ 404.1520(d), 416.920(d).

Alternatively, if Commissioner finds that the claimant's impairment does not meet or equal a listed impairment at step three, the Commissioner will assess the claimant's residual functional capacity ("RFC").[4]  20 C.F.R. §§ 404.1520(e),

---

[4] The Commissioner's RFC analysis takes place between step three and step four.  *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) ("Before [the Commissioner] goes from step three to step four, [the Commissioner] assess[es] [the claimant's] residual functional capacity.").  Regardless of whether it is discussed as part of step three, part of step four, or an intermediate quasi-step, the RFC analysis must come after a determination that the plaintiff has a severe impairment that does not meet or equal a

416.920(e).  A claimant's RFC is the most he or she can do in a work setting despite the limitations imposed by his or her impairment.  20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  The Commissioner determines RFC by considering "all the relevant medical and other evidence" in the record.  20 C.F.R. §§ 404.1520(e), 416.920(e).  The Commissioner must consider all of the claimant's impairments, including those that are not "severe."  20 C.F.R. §§ 404.1545(e), 416.945(e).

In determining whether a claimant is disabled, the Commissioner considers all of the claimant's symptoms "and the extent to which [the] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence."  20 C.F.R. §§ 404.1529(a), 416.929(a).  The Commissioner's evaluation of symptoms is a two-step process.

First, the Commissioner must determine whether "objective medical evidence from an acceptable medical source" shows that "[the claimant] ha[s] a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged."  *Id.*  Second, if such an impairment exists, the commissioner must "evaluate the intensity and persistence of [the claimant's] symptoms," considering "all of the available evidence," to determine "how [the] symptoms limit [the

---

listed impairment at step three and before a determination as to whether the claimant can perform past relevant work at step four.  *See id.*; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iii)-(iv), 416.920(a)(4)(iii)-(iv).

claimant's] capacity for work." 20 C.F.R. §§ 404.1529(c)(1),
416.929(c)(1).

The Commissioner must consider whether the claimant's
symptoms are consistent with objective medical evidence, but
will not disregard a claimant's statements about his or her
symptoms "solely because the available objective medical
evidence does not substantiate [the claimant's] statements." 20
C.F.R. §§ 404.1529(c)(2), 416.929(c)(2). The Commissioner will
carefully consider all information that the claimant submits
about his or her symptoms, including from non-medical sources.
20 C.F.R. §§ 404.1529(c)(2)-(3), 416.929(c)(2)-(3). Further, in
reaching a conclusion, the Commissioner will "consider whether
there are any inconsistencies in the evidence and the extent to
which there are any conflicts between [the claimant's]
statements and the rest of the evidence," including the
claimant's history, laboratory findings, and "statements by [the
claimant's] medical sources or other persons about how [the
claimant's] symptoms affect [the claimant]." 20 C.F.R. §§
1529(c)(4), 416.929(c)(4).[5]

---

[5] The court notes that the SSA recently published a Social Security Ruling
("SSR") relating to the proper evaluation of a claimant's statements about
his or her symptoms, and that this SSR modified prior SSA guidance as to the
ALJ's ability to make a "credibility" determination regarding the claimant's
statements. *Compare* SSR 16-3P, Titles II and XVI: Evaluation of Symptoms in
Disability Claims, 2016 WL 1119029 (SSA Mar. 16, 2016) *with* SSR 96-7P, Titles
II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the
Credibility of an Individual's Statements, 1996 WL 374186 (SSA July 2, 1996).
The court further notes that these rulings do not change the applicable
regulations as set forth in the Code of Federal Regulations, and that prior

## 4. Step Four

At step four, the Commissioner must determine whether the claimant's RFC permits the claimant to perform his or her "past relevant work." 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). Past relevant work is "work that [the claimant] ha[s] done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn to do it." 20 C.F.R. §§ 404.1560(b)(1), 416.960(b)(1). If the claimant can perform his or her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(f), 416.920(f). If the claimant cannot perform his or her past relevant work, the Commissioner will move to step five.

## 5. Step Five

In the fifth and final step of the sequential analysis, the Commissioner determines whether the claimant can perform "alternative occupations available in the national economy" in light of his or her RFC and vocational factors of age, education, and work experience. *Dixon v. Shalala*, 54 F.3d 1019, 1022 (2d Cir. 1995) (quoting *Dixon v. Heckler*, 785 F.2d 1102, 1103 (2d Cir. 1986)); *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If the claimant can transition to other work that "exist[s] in significant numbers

---

to the issuance of SSR 16-3P on March 16, 2016, SSR 96-7P was controlling, and allowed ALJs to assess the credibility of the claimant during the RFC determination. *See* SSR 96-7P, 1996 WL 374186, at *1-2.

in the national economy," the claimant is not disabled; if the claimant cannot transition, the Commissioner must find the claimant disabled.  20 C.F.R. §§ 404.1520(g)(1), 416.920(g)(1), 404.1560(c), 416.960(c).

### 6. Burden of Proof

The claimant must prove his or her case at steps one through four and "has the general burden of proving that he or she has a disability within the meaning of the Act." *Burgess*, 537 F.3d at 128 (citations omitted).  At the fifth step, the burden shifts to the Commissioner to show that in light of the claimant's RFC, age, education, and work experience, he or she is "able to engage in gainful employment within the national economy." *Sobolewski v. Apfel*, 985 F. Supp. 300, 310 (E.D.N.Y. 1997); *see also Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999).  At step five, the Commissioner need not provide additional evidence about the claimant's RFC, and need only show that there is work in the national economy that the claimant can do.  20 C.F.R. §§ 404.1560(c)(2), 419.960(c)(2); *accord Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009); *see also* 20 C.F.R. §§ 404.1520(g)(1), 416.920(g)(1).

### 7. Treating Physician Rule

The Commissioner must evaluate every medical opinion in the record, "[r]egardless of its source," when determining whether an individual is disabled.  20 C.F.R. §§ 404.1527(c);

416.927(c).  The Commissioner will give the medical opinion of a

treating physician "controlling" weight if the Commissioner

finds that the opinion as to the "nature and severity of [the

claimant's] impairment(s) is well-supported by medically

acceptable clinical and laboratory diagnostic techniques and is

not inconsistent with the other substantial evidence in [the]

case record."  20 C.F.R. §§ 404.1527(c)(2); 416.927(c)(2); *see

also Burgess,* 537 F.3d at 128 (describing the principle as the

"treating physician rule" (citations omitted)); *Snell v. Apfel*,

177 F.3d 128, 133 (2d Cir. 1999) ("When . . . substantial

evidence in the record conflicts with the treating physician's

opinion, however, that opinion will not be deemed

controlling.").[6]  Medically acceptable clinical and laboratory

diagnostic techniques include consideration of a "patient's

report of complaints, or history, [a]s an essential diagnostic

tool."  *Green-Younger v. Barnhart*, 335 F.3d 99, 107 (2d Cir.

2003) (quoting *Flanery v. Chater*, 112 F.3d 346, 350 (8th Cir.

1997)); *accord Burgess,* 537 F.3d at 128.

Additionally, opinions from other medical sources that

are not "acceptable medical sources" under applicable

---

[6] The court notes that the SSA has adopted regulations that change the
standards applicable to the review of medical opinion evidence for claims
filed on or after March 27, 2017.  *See* 20 C.F.R. §§ 404.1520c, 416.920c.
Because plaintiff filed his claims before that date, the court applies the
treating physician rule under 20 C.F.R. §§ 404.1527 and 416.927, and not 20
C.F.R. §§ 404.1520c and 416.920c.  *See id.*

regulations are nevertheless "important and should be evaluated on key issues such as impairment severity and functional effects." *Anderson v. Astrue*, No. 07-CV-4969, 2009 WL 2824584, at *9 (E.D.N.Y. Aug. 28, 2009) (quoting SSR 06-03P, Titles II and XVI: Considering Opinions and Other Evidence from Sources Who Are Not "Acceptable Medical Sources" in Disability Claims, 2006 WL 2329939, at *3 (SSA Aug. 9, 2006)).[7]

When a treating physician's opinion is not given controlling weight, the ALJ must "comprehensively set forth his [or her] reasons for the weight assigned to a treating physician's opinion." *Burgess,* 537 F.3d at 129 (quoting *Halloran* 362 F.3d at 33); *accord* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Failure to provide "good reasons" for the weight assigned to a treating physician constitutes a ground for remand. *Snell*, 177 F.3d at 133 (citation omitted); *see also Halloran*, 362 F.3d at 33 ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physicians opinion.").

Although applicable regulations do not exhaustively define what constitutes "good reason" for the weight given to a

---

[7] The court notes that the SSA recently rescinded SSR 06-3P as no longer applicable to claims filed on or after March 27, 2017, and adopted new regulations for evaluating medical sources that are not "acceptable medical sources," as well as nonmedical sources, for such claims. *See Rescission of Social Security Rulings 96-2P, 96-5P, and 06-3P*, 82 Fed. Reg. 15263-01 (Mar. 27, 2017). Because plaintiff's claim was filed before that date, the new regulations do not apply here.

treating physician's opinion, the ALJ must consider, *inter alia*, "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence, and (4) whether the physician is a specialist." *Selian v. Astrue,* 708 F.3d 409, 418 (2d Cir. 2013) (citing *Burgess*, 537 F.3d at 129); *see also* 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6). These same factors may also be used to guide evaluation of other sources' opinions. *Canales v. Comm'r of Soc. Sec.*, 698 F. Supp. 2d, 335, 344 (E.D.N.Y. 2010) (citing SSR 06-3P, 2006 WL 2329939, at *4); *see also* 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6).

## 8. ALJ's Duty to Develop the Record

Because benefits proceedings are non-adversarial in nature, "the social security ALJ, unlike a judge in a trial, must on behalf of all claimants affirmatively develop the record." *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 508-09 (quoting *Tejada*, 167 F.3d at 774); *see also Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999) ("Because a hearing on disability benefits is a nonadversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record." (citation omitted)). Consequently, the ALJ has a duty to obtain additional information from a treating physician where the claimant's medical record is inadequate. *See Schaal v. Apfel*,

134 F.3d 496, 505 (2d Cir. 1998) ("[E]ven if the clinical findings were inadequate, it was the ALJ's duty to seek additional information from [the treating physician] *sua sponte*." (citation omitted)).

Therefore, even though the court will afford the ALJ's determination substantial deference, a remand for further findings may be appropriate where the ALJ does not fulfill his or her affirmative obligation to develop the record. *See Butts v. Barnhart,* 388 F.3d 377, 386 (2d Cir. 2004) ("[I]n cases where the ALJ fail[s] to develop the record sufficiently to make appropriate disability determinations, a remand for further findings that would so plainly help to assure the proper disposition of the claim is particularly appropriate." (internal quotation marks and citation omitted)); *see also Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755-57 (2d Cir. 1982) (noting that, in deciding whether substantial evidence supports the Commissioner's findings, courts must first ensure that claimant has a full and that all relevant facts are developed).

### III. <u>Analysis</u>

#### A. Obligation to Develop the Record

The ALJ failed to develop the record by: 1) not obtaining legible versions of Dr. Filimonov's notes, who was plaintiff's treating psychiatrist; and 2) rejecting Dr.

Filimonov's opinion without asking the doctor to clarify his
reasoning.  Failure to seek clarification of illegible notes
from a doctor constitutes a failure to develop the record,
especially when they are crucial to a plaintiff's claim.  *Medina
v. Commr. of Soc. Sec.*, 13-CV-2323 (KAM), 2016 WL 4402010, at
*19 (E.D.N.Y. Aug. 18, 2016) (citing See *Cutler v. Weinberger*,
516 F.2d 1282, 1285 (2d Cir. 1975) ("Where the medical records
are crucial to the plaintiff's claim, illegibility of important
evidentiary material has been held to warrant a remand for
clarification and supplementation.")  When a physician's records
are largely unreadable, the ALJ has an affirmative duty to seek
out clarification. (*Id.*)

Further, "[w]hen the opinion submitted by a treating
physician is not adequately supported by clinical findings, the
ALJ must attempt, *sua sponte*, to develop the record further by
contacting the treating physician to determine whether the
required information is available."  *Ward v. Colvin*, 16-CV-
05149, 2018 WL 1187398, at *3 (E.D.N.Y. Mar. 7, 2018) (quoting
*Cleveland v. Apfel*, 99 F. Supp. 2d 374, 380 (S.D.N.Y. 2000));
*see also Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998)
("even if the clinical findings were inadequate, it was the
ALJ's duty to seek additional information from [the treating
physician] *sua sponte*.").

Dr. Filimonov was plaintiff's primary
psychiatrist from September 2012 through the date of plaintiff's
hearing in 2015.  Dr. Filimonov saw plaintiff almost weekly.
Much of the records submitted from Dr. Filimonov, however, are
illegible.  The notes that the doctor appeared to make for each
appointment with plaintiff are impossible for the court to read
aside from an occasional word or phrase.  (Tr. 537-71.)  While
his "treating source statement" from October 2013 and "medical
source statement" from March 2015 are slightly more legible,
there are still substantial portions of each that the court is
unable to decipher.  (Tr. 462-71.)  These notes are the most
comprehensive record of plaintiff's mental health. Despite the
inability to read these records, the ALJ concluded that Dr.
Filiminov's finding of "extreme limitations" by the plaintiff
were "inconsistent with the largely normal mental status
findings documented by Dr. Filimonov himself."  (Tr. 21.)  In
addition, the ALJ rejected Dr. Filmonov's clinical observations
by stating that it "appears the opinions of disability have been
based largely upon the claimant's complaints" and "the
assessment appears to be based entirely on the claimant's
subjective complaints, rather than the examiner's clinical
findings and observations."  (Tr. 21.)  Based on the ALJ's
failure to develop a complete record of the plaintiff's
psychiatric history, the case is remanded for clarification and

supplementation of Dr. Filimov's records regarding plaintiff's psychological condition.

Dr. Fazio, a gastroenterologist who saw plaintiff between November 2012 and July 2013, concluded that plaintiff had no work-related limitations whatsoever. (Tr. 433-37.)  The ALJ also stated that it was not known "in what context Dr. Fazio treated the claimant or how often he saw him," and therefore accorded Dr. Fazio's opinion regarding plaintiff's disability little weight. (Tr. 20.)  The ALJ provided no reason for why she did not have adequate information from Dr. Fazio, nor did she discuss any efforts on her part to procure such records.  The ALJ failed to develop the record for Dr. Fazio; accordingly, the ALJ must clarify and supplement Dr. Fazio's records as needed on remand.

**B.  Treating Physician Rule**

The ALJ failed to provide sufficiently "good reason" for affording little weight to multiple treating physicians. The ALJ must give controlling weight to treating physicians unless "substantial evidence" exists to undermine their findings.  "The opinion of a treating physician on the nature or severity of a claimant's impairments is binding if it is supported by medical evidence and not contradicted by substantial evidence in the record." *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (citing *Burgess v. Astrue,* 537 F.3d 117,

128 (2d Cir.2008)).  As previously discussed, although applicable regulations do not exhaustively define what constitutes "good reason" for the weight given to a treating physician's opinion, the ALJ must consider, *inter alia*, "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence, and (4) whether the physician is a specialist."  *Id.* (citing *Burgess v. Astrue,* 537 F.3d at 128); *see also* 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6).

     The ALJ gave little weight to treating physicians, Dr. DeGennaro, Dr. D'Angelo, Dr. Kilkenny, and Dr. Filimonov. Many of these doctors saw plaintiff over the course of many years. The ALJ gave little weight to Dr. DeGennaro and Dr. D'Angelo's opinions that plaintiff was limited well below the full range of sedentary work, because of their inconsistency with plaintiff's "minimal and conservative treatment" and "some of the good clinical findings" by Dr. D'Angelo including full ROM in lumbar spine and normal sensations and muscle strength in the lower extremities).  (Tr. 20-21.)  The ALJ concluded that Dr. D'Angelo's positive findings meant the plaintiff could sit for more than two hours a day.  (*Id.* at 20.)

     The ALJ gave little weight to the opinion of Dr. Kilkenny, a pulmonologist who treated plaintiff for over a

decade for sleep apnea and nasal congestion, and opined that plaintiff was "not capable of performing his work duties and should be disabled." (*Id.*) The ALJ found the doctor's findings inconsistent with other findings that plaintiff's symptoms had been completely resolved with BiPAP, and because Dr. Stepansky also noted this apparent inconsistency. (*Id.*)

The ALJ explained that Dr. Filimonov's opinion that plaintiff's mental condition rendered him disabled was given little weight because the extreme limitations Dr. Filimonov found were inconsistent with plaintiff's GAF of 60 and the doctor's other findings. (*Id.*) The ALJ also noted "consistently good mental status findings." (*Id.*)

The deficiencies the ALJ cites as reasons for disregarding or according little weight to plaintiff's treating physicians does not rise to the level of the "substantial evidence" needed to undermine the treating physicians' findings. Accordingly, on remand, the ALJ must thoroughly explain reasons, if any, for according little weight to certain treating physicians.

## C. Credibility Determinations

The ALJ failed to apply and balance relevant factors in determining whether plaintiff's testimony of his subjective complaints was credible.

> When a claimant's symptoms indicate "a greater
> severity of impairment than can be shown by the
> objective medical evidence alone," the ALJ must
> consider these factors in making a credibility
> determination: (1) the claimant's daily activities;
> (2) the location, duration, frequency, and intensity
> of pain or other symptoms; (3) any precipitating and
> aggravating factors; (4) the type, dosage,
> effectiveness, and side effects of any medications
> taken; (5) other treatment received; (6) other
> measures taken to relieve symptoms; and (7) any other
> factors concerning the individual's functional
> limitations and restrictions due to pain or other
> symptoms.

*Williams v. Astrue*, 09-CV-3997, 2010 WL 5126208, at *14
(E.D.N.Y. Dec. 9, 2010) (citing 20 C.F.R. §§ 404.1529(c)(3)(i)-
(vii), 416. 929(c)(3)(i)-(vii)); *see also Alcantara v. Astrue*,
667 F.Supp.2d 262, 277-78 (S.D.N.Y. Oct. 21, 2009.). "[T]he ALJ
must consider all of the evidence in the record and give
specific reasons for the weight accorded to the claimant's
testimony." *Alcantara*, 667 F.Supp.2d at 277-78 (citing *Lugo v.
Apfel,* 20 F.Supp.2d 662, 663 (S.D.N.Y. Sept. 28, 1998)).

> [The ALJ] must always attempt to obtain objective
> medical evidence and, when it is obtained, [] consider
> it in reaching a conclusion as to whether [a party is]
> disabled. However, [the ALJ] will not reject [a
> party's] statements about the intensity and
> persistence of [a party's] pain or other symptoms or
> about the effect [a party's] symptoms have on [a
> party's] ability to work solely because the available
> objective medical evidence does not substantiate [the
> party's] statements.

20 C.F.R. § 404.1529(c)(2). A finding that the witness is not
credible must . . . be set forth with sufficient specificity to

permit intelligible plenary review of the record. *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 260-61 (2d Cir. 1988) (citing *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 643 (2d Cir. 1983)).

The ALJ found that "claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (Tr. 16.)  The ALJ made this finding as plaintiff's symptoms were "manageable with treatment" and two doctors noted that his nasal symptoms were not consistent with physical exam. (Tr. 17.)  The ALJ also questioned plaintiff's credibility due to the "minimal and conservative" treatment of his symptoms. (Tr. 19.)  This abbreviated credibility analysis did not clearly evaluate the plaintiff's credibility according to the seven factors above as required by statute, nor did it set forth the ALJ's findings with sufficient specificity.  On remand, the ALJ must thoroughly evaluate plaintiff's credibility, and specifically apply the seven factors.

### D.  Consideration of a State Agency Single Decision Maker ("SDM")

The ALJ did not improperly consider the opinion of R. Omosebi, an SDM, as the findings signed by R. Omosebi were also affirmed by Dr. Skoraszewski, PhD, a state agency medical consultant with a doctorate degree who made specific findings

about plaintiff's psychological state.[8]  "SDMs are non-physician disability examiners who may make the initial disability determination in most cases without requiring the signature of a medical consultant," however, "[b]ecause SDMs are not medical professionals, courts have concluded that an SDM's RFC assessment is entitled to no weight as a medical opinion." *Barrett v. Berryhill*, 286 F. Supp. 3d 402, 429 (E.D.N.Y. 2018) (citations omitted).  Regarding Dr. Skoraszewski, however, "[i]t is well settled that an ALJ is entitled to rely upon the opinions of the State Agency's medical and psychological consultants, since they are qualified experts in the field of Social Security disability." *Conlin ex rel. N.T.C.B. v. Colvin*, 111 F. Supp. 3d 376, 387 (W.D.N.Y. 2015) (citing *Karlsson–Hammitt v. Colvin*, No. 13–CV–916S, 2014 WL 5500663, at *3 (W.D.N.Y.2014)).

> (b) Administrative law judges are responsible for reviewing the evidence and making administrative findings of fact and conclusions of law. They will consider prior administrative medical findings and medical evidence from [ ] Federal or State agency medical or psychological consultants as follows:
>> (1) Administrative law judges are not required to adopt any prior administrative medical findings, but they must consider this evidence according to §§ 404.1520b, 404.1520c, and 404.1527, as appropriate, because [] Federal or State agency medical or psychological consultants are highly qualified and experts in Social Security disability evaluation.

---

[8] It is not apparent from the record whether Dr. Skoraszewski is a licensed psychologist in New York, therefore, the court shall refer to him as a medical consultant only.

20 C.F.R. § 404.1513a (b)(1).  An ALJ may weigh a medical
consultant's administrative findings alongside a treating
physician's medical opinion, 20 C.F.R. § 404.1527(e), however,
when determining what weight to accord the opinion or finding,
the ALJ must consider factors including whether the consultant
or physician examined the claimant and the length of the
treatment relationship.  *See* 20 C.F.R. § 404.1520c (c).

     "The opinions of consultative physicians and State
Agency consultants can constitute substantial evidence where . .
. their opinions are consistent with the other evidence in the
record." *Karlsson-Hammitt v. Colvin*, No. 13-CV-916S, 2014 WL
5500663, at *3 (W.D.N.Y. Oct. 30, 2014)(citing *Diaz v.
Shalala,* 59 F.3d 307, 315 (2d Cir.1995)).  However, "[i]n cases
where mental health treatment is at issue, such as this, the
treating physician rule takes on added significance . . . .
[and] the longitudinal relationship between a mental health
patient and his treating physician provides the physician with a
rich and nuanced understanding of the patient's health that
cannot be readily achieved by a single consultative
examination." *Sierra v. Comm'r of Soc. Sec.*, No. 17-CV-10197,
2018 WL 7681060, at *19 (S.D.N.Y. Dec. 6, 2018), *report and
recommendation adopted sub nom. Sierra v. Berryhill*, No. 17-CV-
10197, 2019 WL 1259168 (S.D.N.Y. Mar. 19, 2019) (internal

citations and quotation marks omitted). Here, there is no evidence in the record that Dr. Skorarszewski saw plaintiff at all.

The ALJ's consideration of the opinion of an SDM does not appear to pose a cognizable legal issue, as the opinion considered by the ALJ was also affirmed by a medical consultant, albeit not by a psychiatrist. Although the Disability Determination Explanation form was signed by R. Omosebi, an SDM, on December 3, 2013, (Tr. 67), the same form was also signed in two places by Dr. Skoraszewski, a medical consultant and doctor, on October 29, 2013 and December 3, 2013. (Tr. 66-68.) Further, the opinion accorded "great weight" by the ALJ was the "evidence pertaining to [plaintiff's] mental impairments," which was clearly signed and affirmed by Dr. Skoraszewski. (Tr. 21, 63-66.) Accordingly, the ALJ was entitled to rely upon the opinions of Dr. Skoraszewksi.

However, while medical consultants may have their opinions given significant weight if the opinions are consistent with the record as a whole, the ALJ failed to conduct a thorough analysis of whether Dr. Skoraszewski's opinion was indeed consistent with the record as a whole. The ALJ also failed to sufficiently explain why it gave great weight to the opinion of a non-treating medical consultant and little weight to that of plaintiff's treating psychiatrist. On remand, the ALJ must

provide a detailed analysis of whether Dr. Skoraszewski's opinion is consistent with the record before according it any weight.  The ALJ must also consider and articulate how it applied the factors in 20 C.F.R. § 404.1520c to determine what weight to accord Dr. Skoraszewski's opinion.

### E.  Consideration of Post-Traumatic Stress Disorder ("PTSD"), 20 C.F.R. § Pt. 404, Subpt. P, App'x. 1, Part B2, 12(a)

On remand, the ALJ should consider whether plaintiff qualifies for finding 112.15, "trauma-and stressor-related disorders," which is specifically relevant to plaintiff's diagnosis of PTSD.  The official list of findings was modified with an effective date of January 17, 2017, well after the ALJ made her final determination.  However, a finding for PTSD was added, and the ALJ's determination stated that PTSD was one of plaintiff's "severe impairments."  (Tr. 13); *see also* 20 C.F.R. § Pt. 404, Subpt. P, App. 1, Part B2, 12(a).

**CONCLUSION**

For the reasons stated above, the Court reverses the decision of the Commissioner of Social Security, and remands the case for further administrative action consistent with this Memorandum and Order.  The Clerk of Court is respectfully directed to enter judgment and close this case.


**SO ORDERED.**

Dated:  April 24, 2019
        Brooklyn, New York

                                    /s/
                        _____
                        **KIYO A. MATSUMOTO**
                        United States District Judge